technicalities. Uh, we'll have Mr. Her own call the next case. Thank you, Your Honor. Which if the council and Sosa versus Demsic will now please disconnect council for the next case. If you would please turn on your cameras and your microphones. The next and final case is 19-2166 Tanner versus McMurray. We're ready to proceed. Then Council. Uh, let's see if I can see. Is it Mr Hernandez? Yes. Thank you, Your Honor. Good morning. And may it please May it please the court. My name is Jessica Hernandez, and I represent the plaintiff, Shauna Tanner. In this appeal, this appeal involves two primary issues. Both of them relate to the district court's grant of qualified immunity to the defendants in this case, and both aspects of that ruling that we'll discuss today represent a dangerous and unsupported expansion of qualified immunity in this district in the circuit. The first issue was whether or not these defendants should even be entitled to assert to claim entitlement to qualify immunity. These air not government actors. These air defendants who are employees of a company called Correct Care Solutions. CCS is a private for profit company whose entire business model is to vigorously compete across the country with other companies like it who go for government contracts to provide medical services in prisons. But these defendants were, uh, in fact, uh, in a state facility in a state prison. They were in the environment of a state institution. Isn't that correct? That is correct, Your Honor. In this case, that distinction does not. It's not a distinction that has a difference. In this case, the Supreme Court's decision in Richardson versus McKnight is still directly on point. That case was not only limited to a company that ran a private prison. They were giving a test that has been used in other contexts as well to determine when private actors are entitled to qualified immunity. They laid out the test to look at the history of immunity of common law and then look at the three policy factors behind qualified immunity to see if they would apply. That test still applies in Fularski. We know that in a very different factual context, the Supreme Court applied the exact same test so that the case was not limited to just them in that in that private prison setting here. The fact that they are running the medical unit rather than the entire prison, it does not make it make a difference because it's undisputed that CCS was absolutely the final word on all medical decisions. There was no county oversight about medical care for specific inmates. The evidence is undisputed that Timothy McMurray, one of the defendants in this case, was the final word on that. And so we believe that that is a distinction without a case. I will say, counsel, that the court in Fularski specifically said when it was discussing Richardson, that Richardson was essentially intentionally narrow. And then they set out those elements that you were just discussing are factors. And that first factor seems to me to be the one that is the most question in question here, which is a private firm systematically organized to assume a major lengthy administrative task, and then in parentheses, managing an institution. Now, managing an institution could have just been an example, which was the facts in Richardson. But does that perhaps narrow it to that particular circumstance? And we know that there was no managing of an institution here, um, by the by defendant corporation. Your Honor, no, we do not believe that that parenthetical limits the holding only to an entity or defendants, employees who are managing an institution. Every court that has considered the question you're asking every circuit has ruled that that parenthetical is not limited to that circumstance and has found that defendants, just like CCS, are not entitled to qualified immunity. Every circuit to directly consider this question has applied Richardson even both before and after Filarski and found no qualified immunity for defendants, just like the defendants in this case, which cases are exactly on point, which because some don't involve like a large group like this defendant or a larger company, they may involve medical personnel or a single physician, don't they? But can you point me to which of your cases are the most on point? The Sixth Circuit in McCollum versus tape was dealing with a similar circumstance. Um, the what was that was one non profit doctor, right? Provided services part time. I don't see that quite the same. I'm sorry, Your Honor. In Harrison versus Ash in the Sixth Circuit that involved correctional correctional medical services, which was a large company. Wexford has also been involved in these cases. That was in Rosho versus Aaliyah, which was in the Seventh Circuit. Wexford is a competitor of CCS. Okay, CCS has also were these all post Harrison versus Ash. Was pre Fularski Rosho versus Aaliyah was post Fularski Clark versus Walker. I'm sorry, Miranda versus versus County of Lake was post Fularski, and that involved CCS. So CCS and companies just like it have been found not to have qualified immunity in this situation. All of the policy factors apply exactly the same way. They are a large company administratively organized. I'm sorry, systematically organized to carry out a large task like this. They do it all over the country in over 200 facilities in 38 states for profit. So we don't believe that they are entitled to qualified immunity at all as a legal matter. Has the 10th Circuit at any time hinted as to what the proper resolution of these policy and legal considerations are? That is to say, should employees of private correctional facilities have qualified immunity? Have we spoken to them? Where is this first impression? Your Honor, this question itself would be an issue of first impression in Kellam versus Mars. The court did not address it directly in in the state of Lockett versus Fallon case, which was at the other end of the spectrum in dealing with one doctor who had been contracted to perform an execution. Those policy factors did point that direction, and he was granted qualified immunity. So it's not the same situation, but the court was looking at how a single doctor like that should get the benefit of qualified immunity because those policy factors point the other direction. So it's only through that impression. Thank you. Even if what about? What about other circuits? What's the status of the law in other circuits? The on that issue? Just the circuit. I think the issue under discussion. So I think unless you want to change the topic, I think it's implied that it's the same issue. Please. Yes, Your Honor. Um, each circuit that has addressed this issue has ruled against qualified immunity. Um, the I mentioned the sixth and the seventh. The 11th has also ruled against qualified immunity in that context. Thank you. On the on the second issue, whether these if they were entitled to claim qualified immunity, would it apply to them in this case? Um, the court, the district court was required to view all factors, all facts in the in the plaintiff's favor. If he had done so, and as this court will do on a de novo review, the evidence is simply overwhelming in the record of deliberate indifference to her medical needs. The Supreme Court has made very clear that this is a fact question that a jury can infer conscious disregard disregard just from the fact that need was obvious and that the risk was obvious. And if we look at what we know would have been obvious to these defendants, we first know that it was obvious to them because Shauna Tanner was telling them and the court has said in both the Olson case and the McAllen case that the defendants are not entitled to disregard her complaints. So when she is subjectively telling them from 7 31 morning until over 30 hours later, right before her baby dies in the final stages of labor at 11 o'clock the next day, she's telling them my water has broken. I'm bleeding, bleeding through multiple paths. I'm having cramping. I'm having contractions. I feel my baby's head starting to come out. Can you please check? She's telling them this over and over and over every opportunity that she can every time they listen. Um, we also know that it was obvious they saw it with their own eyes. They saw that her clothing was soaking wet with amniotic fluid. They saw the blood on the pads over and over. They saw the blood clots in the toilet. They saw that she was crying. They saw that she was hyperventilating. They saw that she was anxious. We also know that they knew that this was a substantial risk because they had specific policies to address it. Both their policies and their nursing pathways, which are more along the lines of procedures, indicated that with any of these symptoms that transport was supposed to be immediate, either send her to the hospital or get a doctor to look at her immediately. They did neither of those things until they couldn't even hear the baby's heartbeat a day later. We know that after all of these complaints over and over, what did they do? What was the evidence of their conscious disregard? First, they wait. Luna Defendant Luna waited over an hour to even see her. She first said, I'm too busy. Then when she finally did see her, she over an hour later, she spent six minutes with her. She didn't even go through the pathway carefully that would have told her based on bleeding and cramping and broken water. Send her to the hospital right then. After she was done and had sent Shauna Tanner back to her cell, she filled out the pathway from memory 20 minutes later, and she checked routine. She didn't call Dr. McMurray. She didn't call EMS. It was only an hour after that when a lay person, the risk was obvious to them, called a code 43 so that nurse Luna had to come back to the cell to see Shauna again. That's when she sees the blood clots in the toilet. She sees a or get her to a hospital. She picks up the pad. She said, Is this the blood? Shauna said, Yes, I'm bleeding through several an hour. She said, Well, drug addicts bleed when they're pregnant, and she called her a liar and called her faker as Shauna is crying and hyperventilating and saying, Please don't make me have this baby here. Then they walk back to the medical unit together, and you see on a video that Luna can see that Shauna is leaning against a wall for support and grabbing at her stomach and her groin area in pain. And that continued through Luna's shift. When when Sanchez took over, Sanchez knew what had been happening all day. She knew about the bleeding. She knew about the cramping. She knew about the complaints of broken water. Sanchez didn't even check on Shauna, who was already in segregation, didn't check on her. Her first interaction was just by chance. She saw her during a mid pass. She saw the blood. She still didn't call E. M. S. Later, she gave her a Tylenol. Dr. McMurray had known about this throughout the day as well. He first heard during the code 43 call, and then by the end of the day at home, he would have seen a report that said amniotic a test for amniotic fluid 7.0. That pH is consistent with amniotic fluid. He knew about the bleeding. He knew about the cramping. He knew about the contractions. He signed off on the report. He went to bed the next morning. We're pretty familiar with the facts council because of the because of our review of the record, etcetera. But what about do you want to get to this constitutionally established, clearly established, right? Yes, sir. I do. I think one of the one of the most dangerous things that the district court did in this case was to completely ignore this court's precedent in Oxen Dean and self. Those two cases are both directly on point. And so for the clearly established, they established this law, and they lay out the analysis for this case because one of the court's findings was that because there had been any care at all that they were exercising their medical judgment. Oxen Dean and self together make clear that is not the test. You can't just say that they attempted to render care, and therefore it's in the negligence realm and not deliberate indifference. The self court, the court itself was very clear. You have to go further and ask the question. I don't care what they've already done in terms of care. Was it patently unreasonable? And that's a fact question again. And so the question of whether you give a woman water, more pads and Tylenol when she is standing in front of you soaking wet with amniotic fluid and blood and contractions. That's a jury question of whether that is patently unreasonable. The court ignored that analysis completely. The district court did not even, other than one footnote mentioning the self case, didn't ask those questions in the self analysis. Is this patently unreasonable? Do they recognize their inability to treat it? Would even a layman have found this to be obvious? And those same decisions also make it clearly established as well. In Oxen Dean, he was treated every day for a week, but that doctor was not entitled to qualified immunity. If I could, your honor, I'd like to reserve the remaining time for rebuttal. Reserved. Thank you, Mr Goldstein. It's very helpful to have council's name the left hand side of the screen for it. I appreciate that. Thank you. I'm sure the panel does, too. May it please the court. Council Jake Goldstein on behalf of a police nurse, Luna, Nurse Sanchez and Dr McMurray. With my limited time, I'd like to go straight to a discussion of the subjective and clearly established prongs of plaintiff's delivered indifference claim, because whether or not this court chooses to address the issue of qualified immunity, uh, summary judgment can still be affirmed on either of these two grounds. And with respect to the subjective prong, as the court is very well aware, plaintiff was required to meet a high evidentiary hurdle by presenting evidence that each of the individual defendants consciously and recklessly disregarded a known risk. Miss Tanner and denied her any treatment or deliberately delayed, referring her to a physician or sending her to the hospital where she could receive treatment. She needed, but also I am not by quite evidently, I am not an ob gyn position, but I don't know much about childbirth from a applied standpoint, obviously. But this sounds pretty gross to me. Uh, first, the patient is in custody, and therefore we have to look at this in that context. This is a custodial pregnancy, a custodial birth. She couldn't disregard the advice of the nurse or disregard the advice of the prison attendants and run off to a doctor of her own choice or run off to a hospital of her own choice or provide the kinds of rational, uh, self relief that would normally be attendant to this type of a case. Instead, she is in custody, I repeat, and the facts are gross. I mean, uh, I wouldn't want to have a childbirth under those circumstances, and I can't conceive of a single woman who would either. So, uh, what am I missing? Well, Judge, I think if we take each defendant and their conduct one at a time, I think this will help. It is segment. The defendants, uh, one by one. Only this one gave him an aspirin, and that one gave him a sanitary pad, and the other one comforted or padded her on the head. And so I just look just kind of segment the conduct of each of the defendants and give them all a yes. Well, I don't think that's a that's an accurate characterization of what actually occurred and what is undisputed your honor based on the plaintiff's own written declarations. You know, with with Nurse Luna, for example, um, plaintiff does not dispute that Nurse Luna responded to each of her three requests for medical assistance. She does not further dispute that during each of these requests for medical assistance that Nurse Luna examined Miss Tanner's, um, sanitary pad confirmed that there was only light spotting that Miss Tanner utilized a fetal heart monitor to assess whether or not the fetus was in distress that she was. Did she conduct a cervical examination? She did not. But that was not in within her scope of practice. But what she did do is she called Dr McMurray to advise him of her decide whether or not further treatment was necessary. And what Dr Murray did at that point was say, you know, based on what you're telling me that you believe she had a negative nitrosine paper test, which negative meaning that it did not confirm that there was, um, um, amniotic fluid and that there was only light spotting on the sanitary pad, which again is undisputed. If you look at Nurse and Miss Tanner's written declaration, she confirmed that it was very light spotting and that her vital signs were normal, that the paint that the fetus was in the upper left quadrant of Miss Tanner's abdomen had not quote unquote dropped and thus was not in in in labor that what Dr Murray did at that point based on that information was let's put her in the sheltered housing unit where she can be observed for every 15 minutes. And if she needs additional medical care, we will find out about it that much faster. So that's what he did. So Nurse Luna, did he did he did he examine her? Did he personally see her? He did not personally see her. He did not see. So if a woman is in the hospital and she calls her doctor, the doctor doesn't go see the woman. He doesn't. Uh, he doesn't examine the it. Would that be appropriate standard of care? Well, I don't know. I would think the standard of care. You know, I'm going to do the case research because you haven't given me cases on standard of care, but it doesn't strike me. Just anecdotally is the proper standard of care. Well, the question is respectfully are is not whether this was a medical this amounted to medical malpractice. The question is whether this plaintiff has presented evidence of the subjective component, which requires a showing which will not be met absent an extraordinary degree of neglect. And that cannot be said about the facts here with any of these three defendants, especially with Nurse Luna, who saw her at least four times over the course of her shift time provided her treatment. It's a difference between seeing someone and and taking effective action. All of them recognized they were not OBGYNs. All of them recognized this was above their pay grade in terms of competence. And yet no one referred her to the hospital, even though they had protocol suggesting they should. And it seems to me that that is what the the self the case tensor case is all about, that you are deliberately indifferent if you don't have the expertise is needed that you don't have. Well, I don't think there there is no evidence that they recognize that expert that a special expertise were required at that time. I mean, they knew they knew they in fact, at least one of the nurses testified to that effect. I don't know about the doctor, but they all knew that they were not OBGYNs. And I think just as a matter of self-evident, if you went into a brain surgeon or to a podiatrist or even to a GP and said, please deliver my child, they would in the real world say no, that requires or should have an expert. But I think that I believe without having read all how many hundreds of pages of record there is and of opinion, I believe that there is evidence that they recognize that this expertise. Well, the nurses did not believe that she was in the midst of an obstetrical emergency or that she required emergent care. Was that a reasonable belief at summary judgment taking the evidence on behalf of the plaintiff here? Well, it is because plaintiff does not disagree, does not dispute that all vital signs were normal. They do not dispute that all of the fetal heart tracings were normal. They dispute the manner in which the nitrosine test was performed and that it wasn't performed correctly and that's why it returned a negative result. But they don't dispute that that was what Nurse Luna believed was the result of the test. Or even after the negative result on that particular test, Ms. Tanner continued to have all kinds of symptoms. They didn't stop. And Nurse Luna continued to treat her. And then Nurse Sanchez and Dr. McMurray, you know, why didn't they have a responsibility to perform that gatekeeping function based on all of these continuing symptoms? You know, you can't just say, well, one test that she performed was negative and so, gee, that everything else is fine. She didn't have any further responsibilities. It's the continuing nature of her symptoms that are problematic from, at least as I see it under the self-test. With the continuing nature of her symptoms, they were never getting worse until the following morning. In fact, they stayed relatively stable. She always had very light spotting. Her vital signs were stable. The fetal movement was always regular. And so these nurses, they did not believe that there was an emergent situation that required transfer to a hospital. And in exercising their gatekeeper function, you had Nurse Luna who contacted her supervising medical director, Dr. McMurray, and advised him of what her findings were, of what the various diagnostic test results were. And then he then decided to move her to a higher level area of the MDC for closer monitoring. Without examining her? Well, he wasn't at the jail at that time. And he didn't believe that there was a need to based off of Nurse Luna's findings. But Nurse Luna never said, I gave a cervical exam. Nobody, nothing in the record, showed that anybody gave this woman a cervical exam to see really what they could observe. Well, there may not have been a cervical exam, but there were assessments of her having contractions. I mean, they were trying to determine whether or not this woman was in labor or was not, or was just experiencing cramping, or what the result of the cramping was. And so they, you know, Nurse Luna, for example, contacted Dr. Murray. If Dr. Murray felt that it was necessary for a cervical exam based off of those findings, he could have ordered it. But again, it's the decision of whether or not to go forward with another type of diagnostic test. That may amount to medical negligence, but that doesn't, that doesn't necessarily establish deliberate indifference. And so what, but the procedure of this case is, is the 800 pound gorilla in the, or the 800 pound gorilla or elephant as you wish in the room, in that it's summary judgment. And you're arguing one interpretation of this evidence. But one of the problems I have with the district court opinion was that he did not give all reasonable inferences to the plaintiff. A number of times he didn't, he declined to do so. And I believe that had he given all reasonable inferences, that it's likely that the opposite result would have occurred. It's I see that I'm running quickly running out of time. And I would be remiss if I didn't address the clearly established prong as well, because regardless of how the court does determine the subjective prong, summary judgment can still be affirmed on the clearly established prong and plaintiff in their reply really relied on the Olson, the Booker and the Prado cases and argues that the issue here is simply that Tanner was entitled to receive adequate care for serious medical needs while incarcerated, that that was the clearly established rule. But this description of the alleged clearly established right, improperly seeks to convert the rule of qualified immunity into a rule of virtual unqualified liability by alleging a violation of an extremely abstract light, right, right. Yeah, as recently as this month, this court in Quintana held that the dispositive question is whether the violative nature of the particular conduct is clearly established. And so applied to the to the conduct at par that despise question is really whether it was clearly established that denying a pregnant tree trough pretrial detainees requests for additional diagnostic testing, or a transfer to a hospital could amount to a violation of a constitutional right. And no case. Well, we have we have we have oxygen, which different in that involved a finger versus a pregnancy delivery, but otherwise, very, very similar. They, they recognize that, that this, the diagnosis was normally would require an expert, he knew that there was symptoms that were not progressing normally. And yet, he said, Well, I'm examining you, I'm looking at you, I'm doing I'm stuff. And he tried to make the same argument you're making that it's not a deliberate indifference to medical treatment, because he was providing plenty of medical treatment. And we said that's not enough. We said there that if, if it was apparent, or at least for summary judgment purposes could be concluded to be apparent, that had had he had to take that action to be reasonable in his response. Well, you know, whether that case could be sufficient to have put the defendants on notice when dealing with a pregnant, a pregnant pre child detainee, I don't think that that establishes the question beyond debate by any means. Well, I just don't think that the particularity means you have to find that particular medical condition. That is, you got to find a pregnancy case. In the next case, you got to find a heart problem. The next case, you got to have to find a slipped disc, but only a slipped disc in in four, five and five, six. I think that the Supreme Court is, has made it clear in in its recent cases, that it's not that precise. Well, I don't think I'm, I'm, I'm asserting that there should be a precise and completely on point case. But what I think we, what we are saying here is that there should be a case and there isn't one, there hasn't been one cited in any of plaintiff's briefing below or before this court, where you can, you can hold one of these defendants to, to know that by choose by based on their evaluation of what they saw of this detainee and their, the outcome of their diagnostic testing, that it was clearly established that they would be violating her constitutional rights if they did not immediately send her to the hospital. Even though all of the indications in their mind was that she wasn't in an abstention. How about the self-evident argument? You don't need a clearly established case if, if it's self-evident. I see that my time is up. May I, may I briefly respond to that, Your Honor? Go ahead. Well, these, these, the, I believe Your Honor is referring to the obviously egregious standard and, and here not even plaintiff's description of the events, I think meet that standard. And this is why, is because even she recognizes and admits that the defendants attempted to provide what they believed in good faith was appropriate care responsive to her complaints. Now she takes issue with the, with what they actually did and the quality of those assessments, but that is nothing more than charging them with medical negligence, not the type of extraordinary degree of neglect that's required to meet a deliberate indifference claim. Thank you. Thank you, counsel. Uh, counsel, you had, I think, 30 seconds or so to go. Thank you, Your Honor. Um, we absolutely. One second. We let other counsel go for 48 seconds additionally. So we're going to make yours a minute and 15 seconds, if you will, Mr. Girod. Thank you. Go ahead. Thank you, Your Honor. We absolutely dispute the characterization that the Mr. Goldstein just gave. That is the defendant's version of events. That is not the plaintiff's version of events here. Her version is that while she was repeatedly over 30 hours begging for help that they ignored her, belittled her, called her a liar and left her alone without the treatment that she was asking for. It wasn't that she needed a specific, it wasn't a pelvic exam she needed per se. She needed help. She needed to know, am I in labor and what's happening with my baby and what comes next? Nobody even looked. That's the first thing you do when a pregnant woman says, my water just broke. You rush her to the hospital and you have someone look because then they can do what they need. And that's exactly what would have saved the baby in this case. He died at the very end of labor after 30 hours unmonitored because they haven't made that call that their policies said that they should make that their protocol said that they should make. These defendants did not even use the pathway each time that they dealt with her symptoms. They didn't carefully check and see what comes next. They did nothing. What they did was patently unreasonable, which is what self says. Self and oxygen are exactly on point and you've made that argument. We understand it. Thank you. Your time is up. Counselor excused. The case is submitted. The last case this morning, which is Greg O. V. State Farm is on the briefs. The court will stand at recess until nine in the morning. Uh, the panel will take it but a 10 minute recess and then we'll reconvene, uh, as per plan at that time. Thank you, Council. Mr Jerome, do we need anything?